UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      CRIM. CASE NO. 11-20314

v.                                      PAUL D. BORMAN
                                         UNITED STATES DISTRICT JUDGE

JOHN BRAVATA and
ANTONIO BRAVATA

        Defendants.
_____/

**ORDER DENYING DEFENDANT ANTONIO BRAVATA'S RULE 29
MOTION FOR ENTRY OF JUDGMENT OF ACQUITTAL AND, IN
THE ALTERNATIVE, HIS RULE 33 MOTION FOR NEW TRIAL
JOINED IN BY DEFENDANT JOHN BRAVATA**

I. <u>BACKGROUND</u>

      On May 6, 2013, Defendant Antonio Bravata filed the instant motion (ECF No. 245). On May 10, 2013, Defendant John Bravata filed a Notice of Joinder in this Motion for New Trial Regarding Dismissal of Juror. (ECF No. 248)  On June 20, 2013, the Government filed a Response. (ECF No. 265)  On July 5, 2013, Defendant Antonio Bravata filed a Reply. (ECF No. 271)

      Defendant Antonio Bravata was indicted on three counts; Count 1, charging Conspiracy to Commit Mail and Wire Fraud, with co-conspirators John Bravata and Richard Trabulsy, and two counts of wire fraud: Count 7 (David Gienapp Investment), and Count 9 (Theresa Makowski Investment). After a jury trial, Defendant Antonio Bravata was convicted of the Count 1 conspiracy charge, and acquitted of the two substantive wire fraud charges, Counts 7 and 9.

Defendant contends, *inter alia*, that "the government failed to introduce any evidence that Mr. Antonio Bravata knew about the scheme to defraud." (Def.'s Br. 7.)

The Court concludes that the evidence was sufficient to permit a reasonable juror to find beyond a reasonable doubt, that Defendant Antonio Bravata knew about the fraudulent scheme, knowingly and willfully participated in it, and knowingly made material false misrepresentations to investors in furtherance of the conspiracy's scheme to defraud in order to secure investor funds. In short, that Antonio Bravata knowingly and enthusiastically participated in the conspiracy with his father, Defendant John Bravata to defraud. The Court also concludes that the dismissal of Juror #4 was proper.

## II. STANDARD OF REVIEW

In a Rule 29(c) challenge after a verdict the Court views the evidence in the light most favorable to the Government. *United States v. Gibson*, 675 F.2d 825, 829 (6th Cir. 1982). "A motion for a judgment of acquittal must be granted if 'there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Fawaz*, 881 F.2d 259, 261 (6th Cir. 1989) (quoting *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947)). Normally, "[a] Rule 29 motion is a challenge to the sufficiency of the evidence." *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (internal quotation marks and citation omitted). In the instant case, the guilty verdict decided by the jury should stand "if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. McGee*, 529 F.3d 691, 696 (6th Cir. 2008) (internal quotations omitted).

Federal Rule of Criminal Procedure 33 provides that "upon the defendant's motion, the Court may vacate any judgment and grant a new trial if the interest of justice so requires." The Sixth Circuit has stated that a motion for a new trial should be granted only "in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (internal quotation marks and citation omitted).

III. DISCUSSION

    A. Sufficiency of the Evidence as to Antonio Bravata's Knowledge of the Scheme to Defraud

Trial evidence established that Antonio Bravata was actively involved in soliciting investors, in training BBC seminar presenters, in hiring a presenter, in enriching himself, and in knowingly creating fraudulent responses to investor questions that did not just parrot a script.

David Gienapp testified that he invested after meeting first with John and then Antonio Bravata in 2007. (Feb. 6, 2013, Trial Tr. 72-74.) He testified that Antonio was present at the second meeting with John, and that he did not know that Antonio was receiving an 8% commission/finder fees. *Id*. 94-95.

Barbara Gienapp, David Gienapp's spouse, testified on February 7, 2013, that Antonio Bravata:

1. asked her to invest in BBC Equities. (Feb. 7, 2013 Trial Tr. 8)

2. told her that her principal investment would be safe/guaranteed. *Id*. at 9.

3. told her that if she wanted her money back "just pick up the phone and I could have my money." *Id*. at 9.

4. that she gave her first check to Antonio to invest in June 2007. *Id*. at 11.

5. told her that she would receive 12% interest on her investment paid from property

3

      rents or selling of properties. *Id*. at 12.

    6. told her that the interest to pay her back would be generated on the money she invested. *Id*. at 12.

    7. never told her that her investment might be used to pay other investors' interest, that other investors' money might be used to pay her interest, or that the money she invested might be used to make loans to John Bravata or other managers of BBC Equities. *Id*. at 12.

    Ms. Gienapp's next investment was also through Antonio Bravata in summer 2007. She testified that Antonio never said the invested funds could be used to build houses or pay for houses owned by himself or his father, or buy their clothes or jewelry. *Id*. at 12.

    Ms. Gienapp's final investment through Antonio Bravata came in late summer 2008, at a meeting with Antonio and John at BBC Equities's Southfield office. She testified that she:

    1. was led to believe that the properties in the portfolio she was shown were BBC's. *Id*. at 16.

    2. was told that the properties were generating income. *Id*. at 16.

She further testified that in making her August 2008 investment she was relying on what Antonio Bravata had told her. *Id*. at 18:

    1. that they were investing it "and keeping the promises that they made of buying properties and using the rents for now, and then when the market turned around, they would be selling them for a profit." *Id*. at 19.

    2. that she could take her $160,000 out at any time, according to Antonio Bravata (didn't have many conversations with John). *Id*. at 19.

    3. that in March of 2009, Antonio told her that her investment was safe. *Id*. at 26.

Thus, both Gienapp's were convinced to invest in the "safe" BBC scheme through direct contact with Antonio Bravata, and did so because of his false statements.

    Theresa Makowski, who was hired by BBC in November of 2007 and organized the first

investor seminar in January of 2008, and about 50 seminars in total before she left BBC in September 2008, testified that she saw Antonio Bravata make presentations at 12-15 seminars. (Feb. 12, 2013 Trial Tr. 69, 72.)  She testified that Antonio's seminars contained substantially the same scripted presentation that John Bravata gave: "It was basically a script of John's initial seminar that was given to Tony and other presenters to kind of mold after and made their own." *Id*. at 73.  Reviewing the script of the John Bravata videotape that was provided to presenters, she testified that the content was "similar to the content of the presentations she observed John Bravata give in Kalamazoo and also Antonio Bravata give during the lunchtime seminars that [she] attended." *Id*. at 75.  That videotape stated that last year a 10% dividend was paid which meant that investors saw a 22% rate of return – both John and Antonio Bravata mentioned this false fact at the seminars. *Id*. at 75. In fact, the evidence at trial established that there never was such a return.

The script also mentions that BBC had placed investor funds in Certificates of Deposit at Key Banks, Skybank and Comerica Bank, and "that the investor's principal would allow him – would allow him a two-to-one borrowing rate from Comerica Bank." *Id*. at 76.  The script further stated that investor money was secured by CDs – but this was removed from the presentation script in February/March 2008, "because potential investors were calling Comerica Bank to find out about the CD."  *Id*. at 76-77.  Mrs. Makowski also testified that she "set up appointments for Tony, and Tony would go out and sell the fund."  *Id*. at 79.

She further testified that Antonio Bravata convinced her to invest in BBC Equities. *Id*. at 80, and that in investing, she relied on what she heard at the seminars.  *Id*. at 79, 82. Theresa Makowski testified that Antonio Bravata got an 8% finders fee for her investment, and

5

that she received a $1000 bonus from Antonio for her investment. *Id*. at 88. Thus, it was clear that Antonio was not only getting commissions from securing investor funds, but also making the decision to give Ms. Makowski a "lower level" BBC employee a bonus.

Ms. Bobbie Williams, another BBC investor who testified at trial, testified:

1.  that she attended a BBC Equity seminar at which Antonio Bravata spoke (her second BBC seminar). (Feb. 14, 2013 Trial Tr. 70.)

2.  that Antonio Bravata followed up meeting with her. *Id*. at 70.

3.  that Antonio told her that Williams would absolutely not lose her principal. *Id*. at 74.

4.  that Williams did not receive a BBC private placement memorandum. *Id*. at 75.

5.  that Antonio never told her that investor money would be used to give personal loans to his father, *Id*. at 78, nor that her principal investment would be used to pay other investors' interest payments. *Id*. at 79.

6.  that when she later tried to get her money back from BBC Equities and called Antonio and left messages, he never returned her calls. *Id*. at 81.

Thus, the Gienapps, Makowski, and Williams established that Defendant Antonio Bravata was making false/fraudulent statements in selling BBC Equity "Product." The following two BBC employee/investor witnesses that testified at trial provided evidence establishing that Antonio Bravata well knew that significant statements in his presentations and personal followup were false, and that he was involved in BBC operations, and not just a salesman.

Jeff Minock testified that he was hired to work for Bravata Financial Group/BBC Equities by Antonio Bravata, to arrange lunchtime seminars for Antonio Bravata. (Feb. 14, 2013 Trial Tr. 101) Minock further testified that:

6

1.  Antonio and/or John Bravata explained the BBC Equities business, *id*. at 101, and investments in real estate. *Id*. at 102.

2.  he had videotaped an Antonio Bravata seminar presentation to train himself for his presentation. *Id*. at 103.

3.  that Antonio had bought him two suits to wear for his presentation, and "even mentioned that I should maybe go buy myself a diamond ring for this hand so that I looked like I was worth a million bucks because people that invest money, you know, they want to invest with people that look like they have money." *Id*. at 106.

4.  that Antonio trained him for these presentations. *Id*. at 106.

5.  that the word "guaranteed" was in the script until Dave Circelle from compliance said he could not use it in his presentation. *Id*. at 108.  However, when Minock asked Antonio about using the word "guaranteed," Antonio said: "Don't worry about what Dave says, just say guaranteed.  My Dad says it all the time." *Id*. at 109. Evidence at the trial established that investors were significantly concerned about whether the security/safety of their investment was guaranteed.

6.  that Antonio told him that, as an investor, Minock would not lose his principal investment; he invested through Antonio. *Id*. at 114.

7.  that he watched three seminar presentations given by Antonio Bravata.  (Feb. 15, 2013 Trial Tr. 34.)

8.  that it was Antonio's presentation that caused him to invest.  *Id*. at 50.


Thus, the evidence established that Antonio hired people for BBC, purchased clothes for

7

the presenter to get him presentable for the "Prime Time" presentations, helped train presenters, and personally authorized a bonus for Theresa Makowski. Most significantly, Antonio Bravata overrode the BBC Compliance Individual David Circelle's Order to not use the key word "guarantee," because there was no such guarantee.  Thus, there was sufficient evidence to permit a reasonable juror to find beyond a reasonable doubt that Antonio Bravata took these actions and made these statements in order to defraud prospective investors.

Terry Welsh testified that after meeting with Antonio Bravata in June of 2008, and twice more, thereafter, Antonio told him:

> a.  that recently, BBC had been getting over a 30% monthly return.  Feb. 15, 2013 Trial Tr. 122, 125.
>
> b.  that Antonio got paid from the profits – no commissions.  *Id*. at 125-126.

Welsh further testified that after hearing Antonio Bravata's selling points, he faxed a memo to Antonio on June 13, 2008, setting forth Welsh's specific concerns with the investment proposal. Welsh testified that Antonio faxed back that memo on June 18, 2008, with Antonio's notations, answers and comments, signed it, and wrote that "the above statements are all true and correct." (Gov't Ex. 55, June 18, 2008 Fax, Copy attached to this Opinion as Exhibit A).  Antonio's fax responded that it was a correct statement that in 2007 BBC Equities earned close to $50 million in net distributable profits, and that "no revenue calculated in these net distributable profits derived from loans or sales of shares," (Feb. 15, 2013 Trial Tr. 130-32) and that BBC Equities, LLC purchased real estate exceeded $500 million in value ("not exact but close"). Testimony at trial established that both of these assertions were false.

The Court concludes that all of the above evidence was sufficient to allow a reasonable juror to find Antonio Bravata's guilt of the charged conspiracy beyond a doubt in proofs

2:11-cr-20314-PDB-DRG   Doc # 275   Filed 08/27/13   Pg 9 of 14   Pg ID 6088

introduced at the trial: He knew about the conspiracy, and actively and knowingly joined with Defendant John Bravata in carrying out the conspiracy.  He knowingly participated in the conspiracy to defraud, going so far as to hire an individual, buy him clothes, and countermand Compliance Official David Circelle's order to eliminate the word "guarantee" in selling BBC product. There is no requirement that the Government charge every co-conspirator. In this case, there is overwhelming direct and circumstantial evidence to support the jury verdict affirming Antonio Bravata's conviction as a co-conspirator.

Accordingly, the Court denies Defendant Antonio Bravata's Motion under Federal Rule of Criminal Procedure 29 for judgment notwithstanding the verdict, and his Motion for New Trial under Fed. R. Crim. P. 33 because the manifest weight of the evidence establishes his guilt in the instant trial.

B.  The Removal of Juror #4

Defendant Antonio Bravata's final argument, joined in by Defendant John Bravata, is that their Sixth Amendment right to a fair trial was violated by the Court's decision to remove Juror #4, because of illness.

To attempt to preserve Juror #4's privacy, the Court will not mention the juror's name, the court nurse's specific medical findings, or the juror's specific medical history.

Federal Rule of Criminal Procedure 24(c)(1) permits the court "to replace any jurors who are unable to perform . . . their duties." Thus, a juror may be removed for illness.

Juror #4 was removed on March 14, 2013.  Prior to the 9 a.m. start of trial on that date, at 8:55 a.m., while the jury was in the Court's jury room, the chambers was alerted that a juror was ill.  The Court called down the Court nurse to attend to that juror.  The nurse examined the juror

introduced at the trial: He knew about the conspiracy, and actively and knowingly joined with Defendant John Bravata in carrying out the conspiracy.  He knowingly participated in the conspiracy to defraud, going so far as to hire an individual, buy him clothes, and countermand Compliance Official David Circelle's order to eliminate the word "guarantee" in selling BBC product. There is no requirement that the Government charge every co-conspirator. In this case, there is overwhelming direct and circumstantial evidence to support the jury verdict affirming Antonio Bravata's conviction as a co-conspirator.

Accordingly, the Court denies Defendant Antonio Bravata's Motion under Federal Rule of Criminal Procedure 29 for judgment notwithstanding the verdict, and his Motion for New Trial under Fed. R. Crim. P. 33 because the manifest weight of the evidence establishes his guilt in the instant trial.

B.  The Removal of Juror #4

Defendant Antonio Bravata's final argument, joined in by Defendant John Bravata, is that their Sixth Amendment right to a fair trial was violated by the Court's decision to remove Juror #4, because of illness.

To attempt to preserve Juror #4's privacy, the Court will not mention the juror's name, the court nurse's specific medical findings, or the juror's specific medical history.

Federal Rule of Criminal Procedure 24(c)(1) permits the court "to replace any jurors who are unable to perform . . . their duties." Thus, a juror may be removed for illness.

Juror #4 was removed on March 14, 2013.  Prior to the 9 a.m. start of trial on that date, at 8:55 a.m., while the jury was in the Court's jury room, the chambers was alerted that a juror was ill.  The Court called down the Court nurse to attend to that juror.  The nurse examined the juror

and ascertained a problem with the juror's vital signs, and learned from the juror that there was a medical history of this problem. Thereafter, Juror #4 informed the courtroom deputy that he would "give it a try," and come into the courtroom to begin the trial. Accordingly, that day's proceedings began, albeit late, at 9:37 a.m.

Shortly thereafter, at 10:10 a.m., Juror #4 signaled to the Court that he felt ill, could not continue. "I don't know if I'm going to make it all day, Judge." (March 4, 2013. Trial Tr. 33.) The Court sent the jury back to the jury room, and again called the Court nurse down to examine Juror #4 in the Court's jury room. The nurse again took the juror's vital signs and again determined that there continued to be a medical problem with his vital signs, that was consistent with his medical history. The juror indicated that he could not continue that day.

The Court then had the juror escorted down to the jury assembly room to rest, away from other jurors. A few minutes later, the Judge went down to the jury assembly room with the courtroom deputy to check on Juror #4's medical condition. The juror stated that he could not continue that day, did not know if he could subsequently continue, and called his wife to pick him up at a relative's house in a near-Detroit suburb, to drive him back to his home, 80 miles away from Detroit.

The Court had previously, near the outset of the trial, dismissed one juror at her request, due to a significant health problem that was exacerbated by her jury service. The Court had also dealt with two instances that required excusing the jury for one day because two separate jurors, on separate occasions, had informed the Court that a brief illness prevented them from attending that day, but that they would be able to resume jury service the next day. Both did resume jury service the next day. As to the issue of Juror #4, the Court concluded, that whereas the two prior

infirm jurors had indicated that they were sick for a day due to the flu or a cold, and would return the next day, Juror #4 stated that he was not sure he would be able to continue to serve, and he exhibited an illness that appeared related to an underlying medical condition. This was confirmed by the Court nurse's evaluation of his vital signs, and the Court also confirmed his state of mind, that gave the Court reason to assume that he would be not able to serve the next day and proceed to verdict.

This trial, which had begun with jury selection of January 16, 2013, was approaching the two-month point, and two extra jury trial days had already been added to the trial schedule to accommodate the two, one-day-ill jurors, each of whom had indicated that they would be able to resume jury duty after one day off, and indeed, did so.

In concluding that it was necessary to dismiss Juror #4, and continue with the trial, the Court noted on the record that it had gone down "to the jury room to see for myself the condition of the juror, to talk with him, because I had just heard from other court people, but I wanted to make sure that was his feeling, that he is not well at all, that he can't concentrate. And so I did confirm that and I excused him from service." (March 14, 2013 Trial Tr. 35.)

As part of this argument, counsel for Defendant Antonio Bravata further contends that his client was prejudiced by this juror's removal because Juror #4 had acted in a manner that evidenced favoritism to the defense by asking "the court for details about an exhibit" (a new proposed Defense Exhibit 165 that had been shown to witness Terence Welsh but not introduced into evidence because it contained defense counsel's markings). No evidence supports Defendant's purely speculative contention.

On February 15, 2013 Juror #4 asked:

Your Honor, will we get a number on that? [Exhibit]

The Court responded, "you will get a number." (Feb. 15, 2013 Trial Tr. 148.)

That request by Juror #4, provides no indication that Juror #4 was "favorable to the defense."

Defendant further contends that, because later in the trial, on February 21, 2013, when the Court had not yet designated on the record a number for that exhibit, which had subsequently been sanitized, and the jury requested and then was provided the exhibit number, that episode supported Defendant's "favorable to the defense" argument. (ECF No. 245, Def.'s Br. 17.) The jury's subsequent request demonstrates nothing more than the fact that whereas all other exhibit numbers were provided when admitted, the Court had not yet provided that exhibit number.

Neither of these exhibit number occurrences indicate more than that there had been no exhibit number provided to the note-taking jurors until the Court was reminded at this time. All of the jurors were very attentive, taking notes, and properly wanted a reference point for that proposed exhibit. Nothing about Juror #4's question or the later jury request indicates favorability to the defense.

The Court evaluated Juror #4's medical condition and his ability to serve, with the help of the Court nurse, before excusing him for a medical condition near the latter phase of a two month trial, with more testimony, final argument, instruction and deliberations yet to occur. The Court determined that in addition to Juror #4 not being able to serve the remainder of that day (from 10:30am-1pm), it was not likely that he would be able to serve the next day, and likely thereafter. The Court concluded that the need to continue the trial to closure after two months was the proper trial management conclusion.

Accordingly, the Court DENIES Defendant Antonio Bravata's Motions for Judgment of

Acquittal and for New Trial, and DENIES Defendant John Bravata's Motion for New Trial on the Juror Removal Issue.

      SO ORDERED.

                                          s/Paul D. Borman
                                          PAUL D. BORMAN
                                          UNITED STATES DISTRICT JUDGE

Dated:  August 27, 2013


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 27, 2013.

                                          s/Deborah Tofil
                                          Case Manager

EXHIBIT A

**JANICE & TERRY K. WELSH**
1023 COOLIDGE ROAD
LANSING MI 48912  517 337-7885  337-7485 Fax  927-3177 tjwelsh@sbcglobal.net

6-13-08

Anthony M Bravata
8680 W Grand River Ave
Brighton MI 48816
Fax 810 225-4911  Phn 810 225-0271 861-9979

Dear Tony,

I am faxing you this letter with the photocopies of our IRA policies statements and driver licenses. I have requested expedited full surrender of these policies in order to roll them over into an IRA with you invested in Class D shares of BBC Equities, LLC.

Please, fax back confirmation that the following statements regarding BBC Equities are accurate:

*Not exact But close*

1. In 2007 BBC Equities earned Net Distributable Profits exceeding $50 million.

2. No revenue calculated in these Net Distributable Profits derived from loans or sales of shares.

3. The vast majority of revenue calculated in these Net Distributable Profits derived from the sales and rental of real property.

*Not Exact But close*

4. In 2007. BBC Equities, LLC purchased real estate exceeding $500 million in value.

5. BBC Equities, LLC must honor Class D shareholders' requests to redeem their interests promptly in all cases unless payment is not legally allowable.

6. BBC Equities, LLC has the right to redeem Class C interests without shareholders' consent, but it does not have the right to redeem Class D interests without shareholders' consent.

Thank you, very much.

*/s/ Terry K. Welsh*
Terry K. Welsh

---

The above statements are true and correct for statements # ___All Correct___

Signed _____   6-18-08
For BBC Equities, LLC:                Date

GOVERNMENT
EXHIBIT
55

BBC_0100749