UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,                    Case No. 11-cr-20314
                    Plaintiff,               Hon. Paul D. Borman
v.                                           United States District Judge

D1- John Bravata,

                    Defendant.
_____

## United States of America's Response Opposing Defendant's Motion for Compassionate Release

Defendant John Bravata seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given that he declined a vaccination against COVID-19, that he does not present a medical condition which, according to CDC guidance, places him at enhanced risk during the current pandemic, and that he has substantial time remaining on his sentence, as well as other considerations under 18 U.S.C. § 3553(a).

## I.    Background

### A. Facts and Procedural History

For almost three years beginning in 2006, John Bravata, through his

company, BBC Equities, cheated investors out of a staggering amount of money – almost $50 million. Bravata often met one-on-one with potential investors, targeting older individuals because they typically had savings or a nest egg to invest. Bravata's pitch—the same one that he taught to BBC's sales representatives—was that the BBC investment was safe, interest payments were guaranteed and came from real estate investments, and Bravata would not get paid unless the company was profitable. None of these representations were true. Bravata was spending investor money lavishly on himself. Over the three years of Bravata's scheme, BBC was supported solely by the constant influx of investor funds and was never profitable. BBC's properties were heavily mortgaged and underwater. Yet Bravata and BBC sales representatives under his direction continued to falsely represent to potential investors that BBC's portfolio was strong and their investments would be safe. By June 2009, BBC's obligations had ballooned to $45.6 million and it had only $22,000 in its checking account. (ECF No. 215, PgID.3572). Yet in July, Bravata was still telling investors their money was safe. (ECF No. 205, PgID.2058; ECF No. 206, PgID.2230-31; ECF No. 212, PgID.3216; ECF No.213, Tr.,

PgID.3450; ECF No. 217, PgID.7325). Finally, on July 27, 2009, the SEC persuaded a federal district judge to shut BBC down. (09-cv-12950 ECF No. 22). Following a 39-day trial, a jury convicted Bravata of conspiracy to commit wire and mail fraud, and 14 counts of wire fraud. The district court sentenced Bravata to 240 months in prison. (ECF No. 282, PgID.6214-5). Bravata was also ordered to pay $44,533,437.86 in restitution. (ECF No. 304, PgID.6550).

The Sixth Circuit affirmed Bravata's convictions and his custodial sentence. *United States v. John Joseph Bravata*, 636 Fed.Appx. 277 (6th Cir. 2016). The Supreme Court denied his petition for certiorari on October 3, 2016. *John Joseph Bravata v. United States*, 137 S.Ct. 82 (2016). Bravata timely filed a *pro se* § 2255 petition. (ECF Nos. 420, 420-1, PgID.9190-9322). The government filed its response on June 21, 2021, (ECF. No. 475, PgID. 9956).

Bravata's § 2255 petition is still pending in the district court but is based on issues raised and lost by him in motions for new trial and judgment of acquittal, and on direct appeal. (ECF. No. 273, PgID.6051; ECF. No. 274. PgID.6060; ECF. No. 416. PgID.9086).

## B. Emergency Motion for Relief under 28 U.S.C. § 2241.

On June 5, 2020, after being denied release to home confinement by BOP, Bravata petitioned the United State District Court in the Southern District of Indiana for relief under 28 U.S.C. 2241. <u>Bravata v. Lammer</u>, No. 20-cv-00290-JMS-MJD, (ECF No. 2, PgID.10). The relief he sought and the reasons he sought it are virtually identical to the relief he seeks here: that he should be released to home confinement because of the public health emergency caused by the COVID-19 outbreak and that he fit the criteria set by BOP for release.  Bravata's petition was denied on November 18, 2020. *Id.* at PgID.154. The court found that Bravata could not use § 2241 to challenge the conditions of his confinement, that the CARES act does not permit a court to modify an already-imposed sentence, and that § 2241 was not an appropriate vehicle to challenge BOP's interpretation of federal laws or policies. *Id.* at PgID.159-60.

Bravata is serving his sentence at F.C.I. Terra Haute in Terra Haute, Indiana, with an anticipated release date of May 20, 2028.  He has served approximately 97 months of a 240 month sentence. He has not committed any disciplinary infraction during his time in custody.

## C. Request for Compassionate Release

In April, 2020, Bravata received preliminary approval for release to home confinement under the authority granted BOP in the CARES Act. Ultimately, he was denied release. On May 13, 2020, Bravata sent an email to the warden complaining that he had again been placed on a list for release to home confinement but was removed from it because of objections by the prosecutors on his case. He demanded to know the reasons claiming that the prosecutor could not override the CARES Act. On May 19, 2020, the warden responded and acknowledged that information from the sentencing district played a role in BOP's decision to rescind the decision to release him to home confinement. Bravata was told he could pursue the matter through the administrative process. On August 18, 2020, Bravata sent another email to the warden demanding to know why he was denied. The warden responded that there was no further information to be provided. Bravata continued to complain about BOP's decision and in a final email the warden again responded that there is no further response to provide in the matter. The email exchanges between the warden of FCI Terra Haute and Bravata are attached here as Exhibit A.

Bravata's request for release is based almost entirely on the fact that he was preliminarily approved for release to home confinement and was ultimately denied. He claims this is unfair and violates his Eighth Amendment rights against cruel and unusual punishment and Fifth Amendment due process protections. Bravata makes passing references to the health emergency created by the pandemic and cites to his pattern score of 1 as evidence that he fits the criteria for release. He makes no claim that he has any medical condition that makes him, particularity susceptible to COVID complications or that FCI Terra Haute has a significant outbreak. Bravata has declined to be vaccinated. (Exhibit B).

It is unclear whether Bravata exhausted all of his administrative remedies, but the nature of the email exchanges he had with the warden make it clear that the warden's decision was not going to change. Thus, the government will presume for purposes of this response that more than 30 days have passed since the defendant's request to the warden, and that he therefore has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

The undersigned obtained Bravata's medical records from BOP and reviewed them. The records reveal that the defendant, who is 53 years old, has no significant health issue, nor does he claim to. Given this, the records are not attached to this response as an exhibit but will be made available if the court wishes to review them.

### D. BOP's Response to the COVID-19 Pandemic

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving

inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[1] This initiative, combined with the reduced number of new

---

[1] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus short of widespread vaccination, and inmates inevitably will be infected, and some may succumb, just as in the population at large. But it is notable that the rate of deaths in federal prisons as a whole has been lower than that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.

Specifically, as it relates to the defendant, BOP's aggressive efforts have extended to FCI Terra Haute. That institution houses 1158

inmates. At present, there are 2 inmates who are reported positive, and are isolated while they are treated/recover. There are also 684 current inmates who previously tested positive and have recovered. There have been 2 COVID-related deaths at this institution. The latest statistics are available at www.bop.gov/coronavirus.

### E. Vaccinations

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP receives the COVID-19 vaccine as it becomes available. As of the week of February 8, 2021, doses of the vaccine had been delivered to every BOP institution.

BOP offered the vaccine first to full-time staff because staff members—who come and go between the facility and the community— present a more likely vector for COVID-19 transmission into an institution. As of this time, vaccines have been administered to all willing staff members, and BOP continues to encourage staff members who have not accepted a vaccine to do so. (Staff members may also obtain and have obtained vaccinations from other providers in the community.)

BOP is now in the process of offering vaccines to inmates, proceeding based on priority of need in accordance with CDC guidelines. In general, the vaccine is offered first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates. As of this time, BOP has administered a total of 229,171 doses to staff and inmates nationwide. As of mid-April 2021, BOP estimated that if it continued to receive doses at the then-current pace it will have offered a vaccine to every inmate in its custody by June 1, 2021. As a court recently observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

At FCI Terra Haute, where the defendant is held, BOP has fully vaccinated 333 staff members, and 1871inmates.

The clinical guidance provided to BOP health services professionals is available at

https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_2021031
1.pdf. The latest information on BOP's vaccination efforts, including the
number of completed vaccinations at each institution, is available at
https://www.bop.gov/coronavirus/, and is updated every weekday.

## II.    Discussion

### A. Governing Law

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as
amended by the First Step Act on December 21, 2018, provides in
pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court
> may not modify a term of imprisonment once it has been imposed
> except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of
> Prisons, or upon motion of the defendant after the defendant has
> fully exhausted all administrative rights to appeal a failure of the
> Bureau of Prisons to bring a motion on the defendant's behalf or
> the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may
> reduce the term of imprisonment (and may impose a term of
> probation or supervised release with or without conditions that
> does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section
> 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a
> reduction . . .

- 12 -

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[2]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §

---

[2]Bravata complains that he was denied his due process rights under the Fifth Amendment because he was not given a hearing after his request for release was denied. He does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

3142(g)." Although the Sixth Circuit has concluded that this policy statement is not currently binding in connection with motions filed by defendants, *see United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021), the courts of appeals have recognized that it continues to provide important "guideposts." *United States v. McGee*, -- F.3d --, 2021 WL 1168980, at *10 (10th Cir. Mar. 29, 2021); *see United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.").

In application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    Medical Condition of the Defendant.—
>
>         (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

- 14 -

trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

- 15 -

(D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.).  As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted). That statutory requirement means that a defendant's reasons for release must satisfy two strict criteria. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's reasons must be "extraordinary"—meaning exceptional or uncommon. *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020). The reasons must also be "compelling"—meaning "so great that irreparable harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935, at *3. A defendant must establish both criteria to satisfy the

statute's eligibility threshold. Bravata has satisfied neither.

**B. COVID-19 and Compassionate Release**

The fact of the COVID-19 pandemic, which poses a general threat
to every non-immune person in the country, does not alone provide a
basis for a sentence reduction. The guideline policy statement describes
specific serious medical conditions afflicting an individual inmate, not
generalized threats to the entire population. The Third Circuit therefore
held: "the mere existence of COVID-19 in society and the possibility
that it may spread to a particular prison alone cannot independently
justify compassionate release, especially considering BOP's statutory
role, and its extensive and professional efforts to curtail the virus's
spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see
United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per
curiam) (not precedential) ("[T]he existence of some health risk to every
federal prisoner as the result of this global pandemic does not, without
more, provide the sole basis for granting release to each and every
prisoner within our Circuit."); *see also United States v. Hegyi*, 2020 WL
7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the

presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

The government acknowledges, however, that an inmate who has not been offered a vaccine, who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 463 F. Supp. 3d 585, 597 (W.D. Pa. 2020) (Ranjan, J.)).

The CDC's list of risk factors was most recently updated on March 29, 2021. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release.[3]

---

[3]Before March 29, 2021, the CDC presented two separate lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. Those "might" conditions were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the government maintained – and most courts agreed – that inmates with conditions on the "might" list did not present an extraordinary basis for relief. *See, e.g.*, *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (Cogburn, J.); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension.").

In the March 29 revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers, which discusses the evidentiary basis for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html. The government nevertheless continues to follow CDC guidance and therefore relies on the CDC's expanded list to define what

## C. The Defendant's Circumstances

Here, Bravata is not eligible for compassionate release because he has not identified any condition that he currently has that is on the CDC's list of risk factors, or indeed any chronic medical ailment. The motion should therefore be denied. *See, e.g.*, *United States v. Williams*, 2020 WL 4001045, at *2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, 2020 WL 4193055, at *2 (E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, 2020 WL 4193012, at *1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, 2020 WL 4805356, at *2 (E.D. Pa. Aug. 18, 2020) (DuBois, J.) (same); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (Drain, J.) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (denied for 61-year-old with no other conditions).

---

constitutes an "extraordinary and compelling" basis for consideration of compassionate release of an inmate who has not been offered a vaccine.

It also bears noting that although age is not listed as a separate risk factor, the CDC has emphasized that it is an important indicator of risk. The CDC page regarding risk factors, updated on March 29, 2021, states: "More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45."

Moreover, Bravata was offered the Pfizer vaccine, and he refused it. (Exhibit B). That similarly precludes eligibility for compassionate release. *See, e.g.*, *United States v. Baeza-Vargas*, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) (Teilborg, J.) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") (citing more than a dozen cases). Recently, the Sixth Circuit held that "if an inmate does not present a compelling reason justifying the failure to be vaccinated despite access to the vaccine, a district court would abuse its discretion by granting a motion seeking a sentence reduction under § 3582(c)(1)(A)(i) on the grounds that COVID-19 constitutes an extraordinary and compelling justification." *United States v. Lemons*, ---F.4th---, 2021 WL 4699249, 10/08/2021. C.A.6 (Tenn.).

For all of these reasons, compassionate release is not warranted here. Further, even if Bravata is at elevated medical risk, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate before relief can be granted. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a)

factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same).

This Court's "initial balancing of the § 3553(a) factors during sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction". *United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021). The defendant must therefore "make a compelling case as to why the sentencing court's § 3553(a) analysis would be different if conducted today." *Id.* Here, even if the Court were to find that Bravata established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Bravata's long remaining sentence weighs heavily against release. This Sixth Circuit has repeatedly upheld the denial of compassionate release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*,

978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant] raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008. Bravata was sentenced to 240 months and has a projected release date of May 20, 2028. To date he has served 97 months and has approximately 80 months left to serve.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with many years left on his sentence, like Bravata, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.* Bravata has not even attempted to make this argument.

**1. The Nature and Circumstances of the Offense –
18 U.S.C. § 3553(a)(1)**

John Bravata's offenses were complex, highly orchestrated, and devastating to hundreds of investors. Bravata engaged in an extensive, well-planned scheme to defraud over the course of three years that involved investments of over $50,000,000. Daily, he defrauded numerous individuals, wreaking havoc on the lives of his victims. His scheme demonstrated patent disrespect for the law and for basic moral and ethical behavior. His crimes were not the result of a spontaneous decision borne out of financial distress rather, Bravata's crimes were generated and prolonged by daily and hourly decisions over a three-year period. It was within his sole power to cease his criminal activity at any point. Bravata ignored or simply failed to care that his investors made significant life decisions, including decisions about how to care for ill and dying family members, decisions about how to fund the education expenses of children and grandchildren, and retirement decisions, based upon his false promises and his fraudulent documents.

As illustrated by the following passages from the Victim Impact Statements, John Bravata was responsible not only for wiping away the financial resources of multiple generations within families, the effects of which will be felt for decades to come, but also for causing profound levels of emotional distress:

- In February of 2008 I lost my job of nearly 27 years. I invested my 401K (totaling $241,000) with Bravata.

The little savings I have left has nearly all been exhausted, in order to pay my bills I am 62 years old and cannot find another job. As a result of not having access to my life savings, I am having to work at 3 part-time jobs, I cannot meet my expenses.

- Robert D. Mason

- We are now unable to pay our home mortgage and we are at risk of foreclosure, Our monthly bills/utility payments are behind and our debt is piling because of the financial crisis we are in.

- Salem D. & Renee S. Jamil

- The loss of this investment combined with economic conditions, greater health care costs resultant from the new Federal health care mandates and Michigan's new pension income tax changes influenced my return to the workforce. Reactive to this crime, at 64-years-old, I am substitute teaching at almost full-time weekly employment to offset the aforementioned encumbrances, forestall home foreclosure, avoid bankruptcy, stay off government entitlement programs; and, HEAVEN FORBID, become burden to my family.

- Jack  Dankert

- We lost our retirement savings of $1,253,392.30
- We had to sell our Florida home at a loss which we are still paying off.
- We had to sell two of three cars we owned.
- We had to sell our boat at a loss.
- We had to return our Cancun timeshares to the Timeshare Company because we could not afford the annual maintenance fees.  This resulted in a loss of $12,900.
- We have had to substantially cut back on gifts to our children and grandchildren.
- We have had to cut back substantially on our charitable giving.

- We cannot afford to eat out very often.
- We have had to cut back on all our expenses.
- We cannot afford to take trips and vacations.
- We could lose our Michigan home in the long run.

- William Cowell and Helen Rae Cowell

- My life has changed dramatically since I lost my life savings of $50,000 to John Bravata. I am living solely on my social security check from month to month, in a senior co-op in Riverview, driving a Saturn that is 15 years old and leaks badly. I am $5,000 plus in debt because I do not have any money in savings account as a back up for car problems, medical bills, dental bills. I need a lot of dental work and cannot have it done because I do not have dental insurance and I cannot afford the $1,000's it will take to complete this dental work. I have $12 in my savings account and my checking account has $17. It will take my approximately 11 years to pay the balance because I can only afford the minimum payments. I cannot travel by plan or auto let alone afford the gasoline from month to month to fill my auto. I received federal assistance with my social security and prescription benefits. I am also part of a food program. I had never ever thought, as they say, "in my wildest dreams" that I would ever be in this position and in this position because of trust and belief if John Bravata and his word and his company.

- V.B.

- This was all of my 401K money after working 31 years at GM. When I rolled over my $414,000 to Bravata in February 2009, I was looking for a stable place to put my money since the stock market was so volatile. I was assured that my principal was safe and that I would receive 8% interest on the principal. My plan was to keep the principal until later years (for inflation purposes) and use the interest as it came in

for daily living and certain "project" that I wanted to do – fix up the house and yard and also spend some quality time with my four grandchildren (taking them on an annual weekend trip some place that they would enjoy…like Disney World or Mackinaw, etc.).

This is now impossible.  I have to watch every dollar I spend because I no longer have the $414,000 safety net for later years and neither do I have the $33,000/year that the 8% would have given me.

- J. B.

As illustrated by these statements and others, the financial and emotional impact of Bravata's fraud on his victims was staggering.  Not only did he perpetrate his fraud upon approximately 500 investors, but he proceeded to pour salt into their wounds by prolonging the justice they were entitled to and lulling them into believing there was hope even after BBC was shut down and its limited resources were exhausted.  Once again, it was his selfishness and self-preservation that guided his actions and decisions.  As during his scheme, he thought of only himself and never of the devastated victims.

Considering all these aspects of John Bravata's crime spree, the seriousness of this offense at the very least calls for him to serve his full sentence in a prison setting, not on home confinement.

## 2. The History and Characteristics of the Defendant –
## 18 U.S.C.§ 3553(a)(1)

Given his background and employment, his savvy business sense and extensive connections to the community, Bravata had every opportunity to succeed and thrive in a legitimate career in the insurance industry or in any other business endeavor he chose. Bravata instead chose to abandon honest work to pursue riches, power, and influence through crime.  Unlike most criminal defendants in our district who resort to crime out of financial desperation, Bravata did not hatch his scheme in the face of economic privation.  Despite his capacity to make a living lawfully, Bravata's disrespect and disregard for the law began when as young man he was fired from two law enforcement jobs for lying.  These events did nothing to deter Bravata, who continued his pattern of ignoring the legal and moral consequences of his actions as he planned and executed one of the largest investment fraud schemes in the history of this district.

Further completing the picture of John Bravata's history and character, it is important not to forget that he fled to Italy with the intent to avoid this prosecution.  In fact, he went so far as to investigate Italian extradition laws.

When John Bravata was arrested in this case he was arriving in New York on a flight from Italy. When he was searched Bravata was found in possession of a filled out "Application for Italian Citizenship." John Bravata's history and characteristics, including his remarkable audacity, unquestionably justifies the denial of his request for release to home confinement.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment for the Offense. - 18 U.S.C. § 3553(a)(2)(A)

Requiring Bravata to serve his full sentence in a custodial setting would reflect the seriousness of the offense, promote respect for the law, and adequately punish him for the enormity of his criminal behavior. As described above, Bravata engaged in a notorious and unprecedented long-term fraud scheme that damaged over 500 individual victims.  His conduct was astoundingly thoughtless as he showed no concern for his numerous victims and, instead, enjoyed the fruits of his scheme.  In the face of financial collapse, he used victims' hard earned funds to begin building a 20,000 square foot mansion and purchased expensive cars and jewelry.  This money supported a lavish lifestyle that not only satisfied Bravata's greed, but also impressed and seduced hundreds of victims.  Such callousness and repeated, serious criminal behavior call for a denial of his request for release to home confinement.

### 4. The Need to Afford Adequate Deterrence to Criminal Conduct and To Protect the Public from Further Crimes of the Defendant - 18 U.S.C. § 3553(a)(2)(C)

Denying Bravata's request for release to home confinement is necessary to deter other fraudsters as well as to protect the public from further criminal activity of the defendant.

The public needs to be protected from John Bravata. He is entirely unrepentant. He took the stand at trial and testified for almost four days. He never apologized; he never admitted he was responsible for a single act that harmed a victim. In fact, he portrayed himself as a victim: a victim of the economy, the government, experts and traitorous employees and investors. Bravata insisted his "business model" was sound and well on its way to huge successes. Long after BBC was shut down, Bravata assured old investors their money was safe and only tied up by the government. Long after BBC was shut down, he continued to promote new and similar "opportunities" and to solicit funds. It is easy to predict that when he is released from prison he will immediately resort to criminal activity and will not follow the law even when it would be most profoundly in his interest to do so.

At present, these considerations – including the defendant's risk of danger to the community, his refusal to accept vaccination, and BOP's strenuous efforts to protect inmates against the spread of COVID-19 – counsel strongly against relief.

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. A court recently summarized: "The common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are either (1) properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic, or (2) in cases where the defendants had severe medical conditions that placed them at high risk of coronavirus complications, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Ball*, 2020 WL 4816197, at *6 (E.D. Mich. Aug. 19, 2020) (Lawson, J.).

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

If the Court were inclined to grant Bravata's motion, despite the government's arguments above, the government would request that the Court order that he be subjected to a 14-day quarantine before release.

## Conclusion

The Court should deny Bravata's request for compassionate release.

Respectfully Submitted,
Saima S. Mohsin
Acting United States Attorney

*/s/ Karen L. Reynolds*
KAREN L. REYNOLDS
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: 313-226-9672
Email:karen.reynolds@usdoj.gov

Dated:  October 13, 2021

## Certificate of Service

I hereby certify that on October 13, 2021, the foregoing document was electronically filed by an employee of the United States Attorney's Office with the Clerk of the Court using the ECF system.

s/Karen L. Reynolds
United States Attorney's Office
211 West Fort Street, Suite 2001
Detroit, Michigan 48226

- 32 -